UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Michele Demar,

    Plaintiff,

        v.                                  Civil Action No. 2:16–cv–36–jmc

Richard Slusser,

    Defendant.

## OPINION AND ORDER
(Doc. 26)

Plaintiff Michele Demar brings this action under 42 U.S.C. § 1983, alleging that Vermont State Trooper Richard Slusser[1] violated her Fourth Amendment rights by initiating a traffic stop of a motor vehicle driven by her without having a reasonable suspicion that she was engaged in criminal activity. (Doc. 1 at 4–5, ¶¶ 34–36.) Demar seeks compensatory and punitive damages, and reasonable attorney fees under 42 U.S.C. § 1988. (*Id.* at 5–6.)

Presently before the Court is Slusser's Motion for Summary Judgment, wherein Trooper Slusser argues that there is no dispute as to any material fact and he is entitled to judgment as a matter of law. (Doc. 26.) Slusser asserts that: (1) the subject traffic stop was valid under the Fourth Amendment because it was supported by Slusser's reasonable suspicion that Demar had committed a traffic violation (*id.* at 6–10); and (2) Slusser is

---

[1] Slusser notes that he has since been promoted to the rank of Sergeant (Doc. 26 at 2 n.1), but, like Slusser himself, the Court refers to him as "Trooper" because this was his rank at the time of the relevant incident.

otherwise entitled to qualified immunity because it was objectively reasonable for Slusser to believe that his conduct did not violate clearly established law (*id.* at 10–13). As required by Local Rule 56, Slusser submitted a Statement of Undisputed Material Facts with his Motion for Summary Judgment. (Doc. 26-1.) *See* L.R. 56(a). Demar opposes the Motion, and has submitted a Statement of Disputed Material Facts with her Opposition, in compliance with Local Rule 56(b). (Docs. 33, 33-1.)

Both parties have consented to direct assignment of this matter to the undersigned Magistrate Judge. (Docs. 2, 11.) *See* 28 U.S.C. § 636(c). On May 4, 2017, a hearing was held on Slusser's Motion. For the reasons explained below, the Court GRANTS Slusser's Motion for Summary Judgment (Doc. 26) and DISMISSES Demar's Complaint (Doc. 1).

## **Background**

The material facts, drawn predominantly from Demar's Complaint (Doc. 1) and Slusser's Rule 56 Statement (Doc. 26-1), are summarized as follows. They are undisputed unless otherwise indicated. On the morning of February 14, 2013, Trooper Slusser was on routine patrol in his fully marked state police cruiser on Interstate 89. (Doc. 26-1 at 1, ¶ 5; *see also* Doc. 1 at 2, ¶¶ 5, 9.) Demar was traveling on Interstate 89 at this time, operating a Subaru Impreza bearing Vermont license plate number FAP692.[2] (Doc. 1 at 2, ¶¶ 6–7; Doc. 26-1 at 1, ¶¶ 2–3.) Slusser observed a woman

---

[2] The parties dispute whether the license plate bore a validating sticker. (*Compare* Doc. 26-1 at 2, ¶ 7 ("Trooper Slusser noted that there was no validating sticker on the license plate."), *with* Doc. 33-1 at 1, ¶ 7 ("The Subaru that plaintiff operated on the date in question had a validating sticker on the license plate." (citing Docs. 33-2–33-4)).) This factual dispute is immaterial, however, as it does not bear on the constitutionality of the traffic stop. (*See, e.g.*, Doc. 26 at 9; Doc. 33 at 1.)

2

operating this vehicle and ran a license plate check of FAP692 using the computer assisted dispatch system (CAD) in his cruiser. (Doc. 26-1 at 2, ¶¶ 6, 8.) The CAD search revealed that the Subaru was registered to Henry A. Demar and that he was married to a woman named Michele Demar. (*Id.* ¶¶ 10–11.) "The database contained a description of Michel[]e Demar, her age, and her address, which was the same as Henry Demar's." (*Id.* ¶ 11.) Trooper Slusser also determined from this search that Michele Demar's driver's license had been suspended "as a result of prior convictions for Driving Under the Influence 1, Driving Under the Influence 2, and a Civil Administrative Driving Suspension 2 (an 18-month license suspension)." (*Id.* at 3, ¶ 12.) The parties dispute the extent to which Slusser confirmed that the physical appearance of the driver matched the description of Michele Demar in the database. Demar contends that Slusser merely observed "a female operator" and denies any implication that "Trooper Slusser affirmatively identified [her] as the driver at any time prior to the seizure." (Doc. 33-1 at 1, ¶ 6 (first quoting Doc. 26-3 at 2); *see also* Doc. 33 at 5 ("As the video depicts, the Trooper travelled alongside the Subaru but stopped before pulling alongside the vehicle to a point where he could have corroborated some of the alleged 'description' that he received, or at least the approximate age of the driver, of which he was also allegedly aware."); *id.* at 6 ("The Defendant . . . made no effort to confirm whether the driver matched the description of the person whom he suspected might be the driver.").) By contrast, Slusser states that before initiating the traffic stop he knew "that a woman matching the description of Michel[]e Demar was driving the car," in addition to the other information he discovered through the CAD search. (Doc. 26 at 3.)

3

Slusser activated his cruiser lights and initiated a traffic stop of the Subaru Impreza. (Doc. 1 at 2, ¶ 10; Doc. 26-1 at 3, ¶ 13.) He approached the vehicle and asked the driver if she was Michele. (Doc. 26-1 at 3, ¶ 16; Doc. 33-1 at 2, ¶ 16.) Demar answered affirmatively, and Slusser stated that this was a "problem" because she had a suspended license. (*Id.*) Demar admitted that her license was suspended. (Doc. 1 at 2, ¶ 13; Doc. 26-1 at 3, ¶ 17.) Slusser returned to his cruiser, ran additional CAD searches, and confirmed with dispatch that Demar's license was suspended. (Doc. 1 at 3, ¶¶ 18–19; Doc. 26-1 at 4, ¶ 18.) Slusser then issued Demar a citation for Driving with a Suspended License. (Doc. 1 at 3, ¶ 21; Doc. 26-1 at 4, ¶ 19.) Demar contends that Slusser "offered to dismiss the citation" if Demar would cooperate as an informant (Doc. 1 at 3, ¶ 22), and that Slusser "purposefully used an unlawful seizure . . . in furtherance of his desire to recruit informants" (*id.* at 5, ¶ 40).

In November 2013, the day before a hearing on Demar's Motion to Suppress and Dismiss was scheduled in the Windsor County Superior Court, the State dismissed the charges against Demar. (*Id.* at 4, ¶¶ 31–32.) Demar commenced this action on February 11, 2016 asserting that Slusser's motor vehicle stop was an unconstitutional seizure.

## Discussion

I.  **Summary Judgment Standard**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court is "'required to resolve all ambiguities and draw all factual inferences in favor of the' nonmovant." *Robinson v. Concentra*

*Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999)).  If the moving party demonstrates that there are no genuine issues of material fact, the burden then shifts to the nonmoving party, who must present "'significantly probative supporting evidence' of a disputed fact."  *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

"A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'"  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248).  "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## II. Fourth Amendment Claim

Trooper Slusser argues that he had a reasonable suspicion for the stop because he knew prior to conducting the stop that the vehicle was registered to Henry Demar, that Henry's wife Michele Demar had a suspended license, that the Demars resided at the same address, and that a woman matching Michele Demar's description was driving the

car. (Doc. 26 at 3 (citing Doc. 26-1 at 2–3, ¶¶ 6, 10–12).)  Demar counters that Slusser merely observed "'a female operator'" of the vehicle (Doc. 33-1 at 1, ¶ 6 (quoting Doc. 26-3 at 2)), and "made no effort to confirm" that she in fact matched the description of Michele Demar (Doc. 33 at 6).

As discussed in detail below, the Court concludes that, even if Demar is correct that the subject traffic stop was not valid under the Fourth Amendment, Slusser is entitled to qualified immunity because reasonable officers could disagree about whether an officer has reasonable suspicion for a traffic stop where the officer knows that the spouse of the registered owner of the subject vehicle has a suspended license and suspects that the spouse is the driver of the vehicle.  In *Pearson v. Callahan*, the Supreme Court held that, in addressing summary judgment motions that concern alleged constitutional violations by law enforcement officers, district courts need not decide first whether a constitutional violation occurred—especially when "the constitutional question is so factbound that the decision provides little guidance for future cases"—if it is obvious that reasonable officials could disagree about the legality of the challenged conduct.  555 U.S. 223, 237 (2009) (citing *Scott v. Harris*, 550 U.S. 372, 388 (2007) (Breyer, J., concurring) (counseling against determining whether there is a constitutional violation where the question is "so fact dependent that the result will be confusion rather than clarity"); *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006) ("We do not think the law elaboration purpose will be well served here, where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts.")).  Given this law, and the particular facts of this case, the Court opts

against reaching Demar's Fourth Amendment claim other than considering it as part of the qualified immunity analysis below. *See, e.g., Brown v. City of New York*, No. 13-CV-1018 (KBF), 2016 WL 1611502, at *4 (S.D.N.Y. Apr. 20, 2016); *id.* at *6 ("Even if a jury were to find that defendants' action constituted excessive force in this situation, defendants are nonetheless entitled to qualified immunity because not every reasonably competent officer would have concluded that the force used in effecting plaintiff's arrest was unlawful.").

### III. Qualified Immunity

Trooper Slusser argues that he is protected from liability for Demar's Fourth Amendment claim based on the doctrine of qualified immunity. (Doc. 26 at 1, 10–13.) Demar disagrees and contends that Slusser initiated the traffic stop without reasonable suspicion that she was involved in criminal activity, violating clearly established law and defeating the qualified immunity defense. (*See generally* Doc. 33.)

A claimant may bring suit under 42 U.S.C. § 1983 "to vindicate [her] Fourth Amendment Rights." *Dancy v. McGinley*, 843 F.3d 93, 105–06 (2d Cir. 2016). Qualified immunity protects federal and state officials from suit, however, when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."

7

*Pearson*, 555 U.S. at 231; *see also Ozga v. Elliot*, 150 F. Supp. 3d 178, 188–89 (D. Conn. 2015) ("The purpose of qualified immunity is to allow government officials to do their job free from doubt that they will be sued and liable for money damages because of actions they took that a court might one day decide w[ere] unlawful but that an objectively reasonable official at the time would not have known to violate anyone's rights."). Because qualified immunity protects defendants from "*suit*, not simply liability," *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005), courts should determine whether qualified immunity applies "long before trial" and "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227, 228 (1991) (per curiam) (collecting cases). *See also White*, 137 S. Ct. at 551 (Supreme Court noting that it has recently "issued a number of opinions reversing federal courts in qualified immunity cases," and explaining that the defense "is effectively lost" if a case is improperly allowed to proceed to trial (second quoting *Pearson*, 555 U.S. at 231)).

In conducting the qualified immunity analysis, the court considers whether (1) "the official violated a statutory or constitutional right," and (2) whether that "right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "Deciding a case under prong two saves scarce judicial resources by avoiding unnecessary decisions [about] whether certain conduct violates a constitutional or statutory right, when it is beyond reproach that the

conduct was not objectively unreasonable in light of existing law." *Coollick v. Hughes*, 699 F.3d 211, 219–20 (2d Cir. 2012) (citing *Pearson*, 555 U.S. at 237). As noted above, the Court elects to do so here, because even assuming Demar has alleged facts sufficient to make out a Fourth Amendment violation, Slusser is nevertheless entitled to qualified immunity because he did not violate a clearly established right.

Under the "clearly established" prong, a law enforcement officer is entitled to summary judgment on the basis of qualified immunity "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part on other grounds in Pearson*, 555 U.S. at 240–43; *see also Ozga*, 150 F. Supp. 3d at 189 ("Where, as here, qualified immunity is asserted at the summary judgment stage, a court may grant judgment if it is clear—after viewing the facts in the light most favorable to plaintiff—that reasonable law enforcement officers could have disagreed about whether defendants' conduct violated the law." (citing cases)). An official violates a clearly established right "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"[3] *al-Kidd*, 563 U.S. at 741 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

---

[3] If the material facts are not seriously disputed, the issue of whether a reasonable official "should have known he acted unlawfully is a question of law better left for the court to decide" at the summary judgment stage. *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990), *cert denied*, 498 U.S. 967 (1990)). The Court is also mindful that deciding this issue is "consistent" with the duty to resolve qualified immunity as early as possible in the proceedings. *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985)).

9

"For a right to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarity to have placed the constitutional question 'beyond debate' in the particular factual context at issue." *Kerr v. Morrison*, 664 F. App'x 48, 51 (2d Cir. 2016) (Summary Order) (quoting *al-Kidd*, 563 U.S. at 741); *see also Saucier*, 533 U.S. at 206 (stating that qualified immunity protects officers from the Fourth Amendment's sometimes "hazy border[s]"); *Coollick*, 699 F.3d at 221 ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992))). Accordingly, the Supreme Court has repeatedly warned that "'clearly established law' should not be defined 'at a high level of generality,'" but instead must be "'particularized' to the facts of the case." *White*, 127 S. Ct. at 552 (first quoting *al-Kidd*, 563 U.S. at 742, then quoting *Creighton*, 483 U.S. at 640). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (first alteration in original) (quoting *Saucier*, 533 U.S. at 205). Generally, only case law from the Supreme Court and the Second Circuit in effect "at the time of the alleged violation is relevant in deciding whether a right is clearly established," *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004), but a right may nevertheless be considered clearly established if decisions by other courts, including in other circuits, plainly "foreshadow a particular ruling on the issue," *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)). Similarly, in the absence of case law from the

relevant circuit court of appeals, an officer may point to lower court precedent, even out of circuit, to demonstrate that a reasonable officer would have believed his actions were lawful. *See Pearson*, 555 U.S. at 244–45 ("Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions.").

"The . . . dispositive inquiry" in the clearly established right analysis "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Saucier*, 533 U.S. at 202). The officer's subjective belief about his conduct is irrelevant. *See, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998); *Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 106 (2d Cir. 2003). An officer is shielded by qualified immunity even when his or her actions are based on a reasonable mistake of law, fact, or both. *See, e.g.*, *Pearson*, 555 U.S. at 231; *see also al-Kidd*, 563 U.S. at 743 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."). "But, if 'it is obvious that no reasonably competent officer' would have taken such action, that officer will not be immune." *Dancy*, 843 F.3d at 106 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity thus "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341; *see also Mullenix*, 136 S. Ct. at 308.

Demar argues that it is clearly established law that officers must have particularized reasonable suspicion of criminal activity to justify a traffic stop under the Fourth Amendment. (*See, e.g.*, Doc. 33 at 4–5.) She claims that Trooper Slusser's knowledge that a female was driving the vehicle, and that the registered owner was

11

married to a woman with a suspended license, did not "support[] his inference that [Demar] was the female driver," and that this inference was merely a hunch or a guess, falling short of the reasonable suspicion standard. (*Id.* at 5.)

The parties do not dispute that the Fourth Amendment guarantees the right to be free from even temporary seizures during a traffic stop, unless the officer has reasonable suspicion that the vehicle's occupants are engaging in criminal activity. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Courts are required to consider the facts under the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274 (citations omitted) (quoting *Terry*, 392 U.S. at 27); *see also Dancy*, 843 F.3d at 106 ("This [reasonable suspicion] standard is 'not high'; rather, it requires 'only facts sufficient to give rise to a reasonable suspicion that criminal activity "may be afoot."'" (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014))). Finally, "[r]easonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000); *see also Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001).

Driving with a suspended license is a criminal offense under Vermont law,[4] Vt. Stat. Ann. tit. 23, § 674, and "reasonable suspicion that a motorist is unlicensed" is valid grounds for a traffic stop under the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). *See also Arizona v. Johnson*, 555 U.S. 323, 331 (2009); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009); *State v. Ryea*, 153 Vt. 451, 571 A.2d 674, 675 (1990). Officers may determine that a driver has a suspended license based on a Department of Motor Vehicles (DMV) records search. *See McGuire v. City of New York*, 142 F. App'x 1, 3 (2d Cir. 2005) (holding that "a police officer, upon ascertaining from a DMV check that a motorist's license has been suspended," has probable cause to arrest the motorist, without confirming whether he or she was aware of the suspended license); *State v. Lanoue*, 156 Vt. 35, 587 A.2d 405, 406 (1991) (finding officer had reasonable suspicion to conduct a traffic stop based on a DMV computer check indicating the driver's license was suspended, even though this information later proved to be incorrect).

The parties do not direct the Court to any Supreme Court or Second Circuit precedent analyzing whether an officer has reasonable suspicion for a motor vehicle traffic stop where the officer ascertains that the registered owner's *spouse* has had his or her license suspended and the officer suspects that the spouse is the driver of the vehicle

---

[4] As noted at the May 4, 2017 hearing, driving with a suspended license is not a felony offense under Vermont law as initially asserted in Slusser's Motion. (Doc. 26 at 6.) *Compare* Vt. Stat. Ann. tit. 13, § 1 (defining felony as "any offense whose maximum term of imprisonment is *more than two years*, for life[,] or which may be punished by death," and stating that "[a]ny other offense is a misdemeanor") (emphasis added), *with* Vt. Stat. Ann. tit. 23, § 674 (stating that driving with a suspended license carries a fine of not more than $5,000, up to two years of imprisonment, or both, and additional penalties for multiple suspended license offenses committed within a certain timeframe).

13

being operated, nor can the Court find any. But Slusser points to numerous cases in Vermont state courts and other jurisdictions where courts have determined that an officer had reasonable suspicion for a traffic stop where the officer knew that the *owner* of the vehicle had a suspended license and, absent evidence to the contrary, could infer that the driver was the owner. *See, e.g.*, *State v. Edmonds*, 2012 VT 81, ¶ 8, 192 Vt. 400, 404, 58 A.3d 961, 964 (finding that two traffic stops were supported by reasonable suspicion, based on "the troopers' knowledge that the owner of each car was under license suspension, and the reasonable inference that the driver of a car could be its owner"). Extending this inference, an Illinois court held that a police officer had reasonable suspicion to stop a male driver, where a computer check of the vehicle's license plate indicated that the female owner's husband was a regular driver of the vehicle, included a description of him, and indicated that his license was suspended. *See People v. Blankenship*, 819 N.E.2d 49, 53 (Ill. App. Ct. 2004) (citing *Vill. of Lake in the Hills v. Lloyd*, 591 N.E.2d 524, 526 (Ill. App. Ct. 1992) ("Police knowledge that an owner of a vehicle has a revoked driver's license provides a reasonable suspicion to stop the owner's vehicle for the purpose of ascertaining the status of the license of the driver.")).

Trooper Slusser argues that he had reasonable suspicion for the stop because he knew that the vehicle was registered to Henry Demar, that Henry's wife Michele Demar had a suspended license, that the Demars resided at the same address, and that a woman matching Michele Demar's description was driving the car. (Doc. 26 at 3 (citing Doc. 26-1 at 2–3, ¶¶ 6, 10–12).) Demar counters that Slusser merely observed "'a female

operator'" of the vehicle (Doc. 33-1 at 1, ¶ 6 (quoting Doc. 26-3 at 2)), and "made no effort to confirm" that she in fact matched the description of Michele Demar (Doc. 33 at 6). Viewing the facts in the light most favorable to Demar, the Court must presume at this stage that Trooper Slusser did not attempt to confirm that the driver matched the description of Demar in the CAD search database, other than noting that the driver was female.[5]

Nevertheless, the Court cannot conclude that "no reasonably competent officer" in Trooper Slusser's position would have conducted a traffic stop, because there were numerous factors from which a reasonable officer could have concluded that he had reasonable suspicion under the totality of the circumstances. *Malley*, 475 U.S. at 341; *see also Saucier*, 533 U.S. at 208. There is no bright line rule under the Fourth Amendment that an officer must affirmatively and methodically identify the driver before initiating a traffic stop, *see Coollick*, 699 F.3d at 221, especially when he is aware of other "specific and articulable facts," and makes reasonable inferences from these facts, suggesting the

---

[5] Trooper Slusser submitted a video recording of the incident, captured from the vantage point of his police cruiser. (Doc. 26-4.) "[W]here [there] is a discrepancy between the parties' versions of the facts and a recording of the incident, a court may rely on an unaltered video or audio recording." *Burwell v. Peyton*, 131 F. Supp. 3d 268, 293 (D. Vt. 2015) (collecting cases), *reconsideration granted in part on other grounds*, 2015 WL 6874250 (D. Vt. Nov. 9, 2015); *see also Scott v. Harris*, 550 U.S. 372, 380, 381 (2007) (holding that the lower court, on a motion for summary judgment, "should have viewed the facts in the light depicted by the videotape," instead of adopting a "version of the facts" that was "blatantly contradicted by the record, so that no reasonable jury could believe it" on a motion for summary judgment). The Court has viewed the video of the traffic stop but finds it unnecessary to rely on here, because neither party's version of the facts is "blatantly contradicted" by the video evidence "so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. Accordingly, because Demar is the non-moving party, the Court accepts her version of the facts: Slusser did not approach Demar's vehicle closely enough to have "corroborated some of the alleged 'description' that he received [of her]" or even her "approximate age." (Doc. 33 at 5.)

15

driver's identity, *see Elmore*, 482 F.3d at 178. In other words, at the time of the stop, there was no precedent putting the question of a traffic stop's constitutionality under these or analogous factual circumstances beyond debate, *al-Kidd*, 563 U.S. at 741, and case law from Vermont and other state courts at least suggest that Slusser's inference that Demar was driving was justified. At most, the circumstances of this stop may fall within the Fourth Amendment's "hazy borders," but officers are protected by qualified immunity in this uncertain, fact-specific realm. *Saucier*, 533 U.S. at 206; *see also Mullenix*, 136 S. Ct. at 308; *Coollick*, 699 F.3d at 221. To the extent that Demar alleges Slusser "purposefully" initiated the traffic stop "in furtherance of his desire to recruit informants" (Doc. 1 at 5, ¶ 40), Slusser's subjective intent has no bearing on the reasonable suspicion analysis. *See Bayless*, 201 F.3d at 133; *see also Dancy*, 843 F.3d at 111 ("Because subjective intentions are irrelevant to [the reasonable suspicion] analysis . . . , we do not assess what was motivating this police officer when he decided to stop [the suspect]." (citing *Whren*, 517 U.S. at 813)).

Demar's reliance on *Hope v. Pelzer*, 536 U.S. 730 (2002) and *United States v. Lanier*, 520 U.S. 259 (1997) is misplaced. (Doc. 33 at 3–4.) Demar argues that Trooper Slusser should have known he did not have reasonable suspicion for the stop because "[a] general constitutional rule already identified in the decisional law may apply with *obvious clarity* to the specific conduct in question," even if an analogous factual circumstance has not been considered by the courts. (*Id.* at 3 (quoting *Lanier*, 520 U.S. at 271) (emphasis added).) But a closer look at these cases demonstrates that general rights may only put officers on notice of unlawful conduct in cases where the

constitutional or statutory violation is readily apparent. In *Lanier*, the Supreme Court vacated the Sixth Circuit's holding that a sitting judge who had sexually assaulted court employees, job seekers, and litigants could not be liable under a federal criminal statute that made it unlawful to deprive a person under color of state law rights protected by the Constitution. The Sixth Circuit had reasoned that the public was not on notice that the statute at issue "include[d] . . . sexual assault crimes within its coverage," because the Supreme Court had not explicitly addressed, under "fundamentally similar" facts, the right to be free from sexual assault and harassment. *Lanier*, 520 U.S. at 263 (quoting *United States v. Lanier*, 73 F.3d 1380, 1384, 1393 (6th Cir. 1996), *vacated*, 520 U.S. 259 (1997), 114 F.3d 84 (6th Cir. 1997)). Rejecting this reasoning, and particularly the purported need for "fundamentally similar" facts, the Supreme Court explained that officials simply need "reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 269. The Court offered the following analogy by way of explanation: "There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." *Id.* at 271 (alterations in original) (quoting *Lanier*, 73 F.3d at 1410 (Daughtrey, J., dissenting)). Similarly, in *Hope*, the Supreme Court held that a factually similar case was unnecessary to find that officials had violated a prisoner's clearly established rights under the Eighth Amendment, where officials had handcuffed a shirtless prisoner to an outdoor hitching post, exposing him to sunburn, taunted him, and deprived him of water and access to a bathroom for seven hours. 536 U.S. at 741, 745–46.

These cases underscore that the courts cannot ignore commonsense applications of constitutional or statutory law to blatantly illegal conduct, merely because the case presents a novel factual scenario. But the motor vehicle stop at issue here was not blatantly unlawful, and it is far from "obvious" whether Trooper Slusser lacked reasonable suspicion under the Fourth Amendment. *Lanier*, 520 U.S. at 271. Trooper Slusser did not rely merely on broad, generalized factors that could "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the [c]ourt to conclude" that these factors "could justify a seizure." *United States v. Bristol*, 819 F. Supp. 2d 135, 144 (E.D.N.Y. 2011) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)) (Police officers' hunch that vehicle was unlicensed livery cab operating in violation of city administrative code, coupled with officers' observations that the passengers were riding in back seat of vehicle, while no one was seated in the front passenger seat, that the model of vehicle was a type commonly used as livery cab, and that the vehicle had license plate from neighboring state and no signage indicating it was licensed livery cab, did not provide officers with reasonable suspicion of criminal activity to justify an investigatory stop). Instead, Trooper Slusser made several observations specific to the Subaru and Demar, and inferred rational facts from those observations. In short, it is not clearly established whether an individual similarly situated to Demar had the right to be free from a traffic stop under the precise circumstances, and an objectively reasonable officer in Slusser's position could have believed there was reasonable suspicion for the stop. *See Garcia*, 779 F.3d at 92. Quite simply, Trooper Slusser's conduct was not "plainly incompetent" or a knowing violation

of the Fourth Amendment. *Malley*, 475 U.S. at 341. Accordingly, Trooper Slusser is entitled to qualified immunity and thus his Motion for Summary Judgment (Doc. 26) is GRANTED and Demar's Complaint (Doc. 1) is DISMISSED.

## IV. Leave to Amend

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). It is well settled, however, that "leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). Amendment is futile when the cause of action is substantively flawed and better pleading will not cure the complaint's defects. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990). Any amendment by Demar would be futile here because her claims against Slusser are barred by qualified immunity—an obstacle that better pleading cannot overcome.

## **Conclusion**

For the reasons set forth above, Slusser's Motion for Summary Judgment (Doc. 26) is GRANTED and Demar's Complaint (Doc. 1) is DISMISSED with prejudice.

Dated at Burlington, in the District of Vermont, this 16th day of May, 2017.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge